Filing
Fee
Paid

**ORIGINAL**

No
CV-30

FILED
CLERK, U.S. DISTRICT COURT

4/27/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DD _____ DEPUTY

1   Mark S. Hardiman (SBN 136602)
2   Katherine A. Bowles (SBN 287426)
3   **NELSON HARDIMAN LLP**
    1100 Glendon Avenue, 14th Floor
4   Los Angeles, CA 90024
    Telephone:   (310) 203-2800
5   Facsimile:   (310) 203-2727
6   Email: mhardiman@nelsonhardiman.com
             kbowles@nelsonhardiman.com
7

8   Attorneys for Relators
    Sydney Guo, M.D., and Edward Li, M.D.
9

10          **UNITED STATES DISTRICT COURT**
        **CENTRAL DISTRICT OF CALIFORNIA – WESTERN**
11

12  UNITED STATES OF AMERICA        CASE NO.:  2:20-cv-03814-DMG(RAOx)
    *ex rel.* SYDNEY GUO, M.D., and
13  EDWARD LI, M.D.,                **COMPLAINT FOR VIOLATIONS OF**
                                    **THE FALSE CLAIMS ACT, 31 U.S.C.**
14                                  **§§ 3729-3733**
                     Plaintiffs,
15
                                    **(UNDER SEAL)**
16       v.
                                    **DEMAND FOR JURY TRIAL**
17  CHRISTOPHER SHAWN
18  SKILLERN, M.D., an individual,
    and CSS ENTERPRISES, INC., a
19  professional medical corporation,
20
                     Defendants.
21

22

23

24

25

26
RECEIVED
CLERK, U.S. DISTRICT COURT

4/20/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DD _____ DEPUTY
27

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

Plaintiff United States of America ("United States"), by and through Relators Sydney Guo, M.D. and Edward Li, M.D. ("Relators"), alleges as follows:

## **INTRODUCTION**

1.     Relators bring this action on behalf of the United States of America against Christopher Shawn Skillern, M.D., a vascular surgeon, and CSS Enterprises, Inc. ("CSS"), his professional medical corporation (collectively, "Dr. Skillern"), who treated Medicare and other federal healthcare program patients, for treble damages and civil penalties under the False Claims Act, Title 31, United States Code, Sections 3729 – 3732 ("FCA").

2.     From approximately 2016 to 2019, Dr. Skillern knowingly submitted and caused the submission of false and fraudulent claims by West Coast Vascular, a physician group practice, to the Medicare Program and to the Government Employee Health Association ("GEHA"), a Federal Employees Health Benefits Program ("FEHBP") plan, for medically unnecessary and harmful outpatient diagnostic angiograms and peripheral vascular interventions ("PVIs"), resulting in millions of dollars in program overpayments, in violation of  the False Claims Act, Title 31, United States Code, Sections 3729 – 3732 ("FCA").

3.     Apart from defrauding the Medicare and FEHBP programs, Dr. Skillern's performance of medically unnecessary PVIs on these program beneficiaries also exposed them to a serious danger of physical harm because unnecessary PVIs can worsen peripheral vascular disease, rupture or create blockages in arteries, and can increase the risk of losing the leg being treated.

## **JURISDICTION AND VENUE**

4.     This Court has subject matter jurisdiction under 28 U.S.C. § 1345.  The Court may exercise personal jurisdiction over Dr. Skillern and CCS Enterprises, Inc. under 31 U.S.C. § 3732(a) because Dr. Skillern resides within this District and CSS was and is doing business within this District.

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor,
LOS ANGELES, CALIFORNIA 90024

5.      Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) because Dr. Skillern resides in this District, CSS transacted business in this District, and a substantial part of the events giving rise to the above-captioned action occurred in this District, including Dr. Skillern's treatment of Medicare and GEHA patients for whom claims were submitted to those programs in this District.

6.      Prior to filing this complaint, Relators voluntarily disclosed to the United States the information on which the allegations and transactions described in this action are based.

## PARTIES

### Relators

7.      Relators bring this action on behalf of Plaintiff United States and its agencies, the United States Department of Health and Human Services ("DHHS") and its component, the Center for Medicare and Medicaid Services ("CMS"), which administers the Medicare Program, and the U.S. Office of Personnel Management ("OPM") which administers the Federal Employees Health Benefits Program ("FEHBP"), including through a contract with Government Employee Health Association ("GEHA"), a FEHBP carrier. At all times material to this action, CMS has been an agency within the DHHS and has administered the Medicare Program, which paid benefits from funds provided by the Federal Government, including the payment of claims for Dr. Skillern's treatment of Medicare patients.  At all relevant times, OPM was an agency of the United States which administered the FEHBP, which paid benefits from funds provided by the Federal Government, including the payment of claims for Dr. Skillern's treatment of patients enrolled in GEHA's FEHBP plan.

8.      Relator Sydney Guo, M.D. ("Dr. Guo") is a physician licensed to practice medicine in California and is a resident of Los Angeles County, California. He is board certified in vascular surgery.

9.      Relator Edward Li, M.D. ("Dr. Li") is a physician licensed to practice

1   medicine in California and is a resident of Santa Barbara County, California. He is

2   board certified in general surgery and vascular surgery.

3       10.    Relators have direct and independent knowledge of Dr. Skillern's

4   submission and causing the submission of false claims to the Medicare Program and

5   to GEHA, a FEHBP plan, for medically unnecessary outpatient angiograms and

6   PVIs because Relators were partner physicians with Dr. Skillern in West Coast

7   Vascular, the physician group practice through which Dr. Skillern submitted and

8   caused the submission of such claims.

9   Defendant

10       11.    Defendant Christopher Shawn Skillern, M.D. ("Dr. Skillern") is a

11   physician licensed to practice medicine in California and, on information and belief,

12   a resident of Ventura County, California. He is board certified in general surgery

13   and vascular surgery.

14       12.    Defendant CSS Enterprises, Inc. ("CSS") is a California professional

15   medical corporation, incorporated by Dr. Skillern, who is the sole shareholder,

16   officer and director. On information and belief, Dr. Skillern exercises sole and

17   complete dominion over CSS, uses the corporate form of CSS in disregard of

18   corporate formalities, has allowed CSS to become undercapitalized, employs CSS

19   as his agent to perpetuate acts which furthered the fraud scheme alleged below,

20   commingles corporate and personal funds, and in all respects uses CSS in a manner

21   such that all separateness between the individual and corporation has ceased to exist.

22   **FACTUAL ALLEGATIONS**

23   The Medicare Program

24       13.    The Medicare program is a federally funded health care program

25   providing health insurance coverage to people who are aged 65 and over or who

26   have certain physical disabilities. Enacted in 1965, the program includes Medicare

27   Parts A and B, both insurance programs that cover inpatient and outpatient services,

28   respectively. Medicare is administered by the U.S. Department of Health & Human

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

4
COMPLAINT

Services through its agency, the Center for Medicare and Medicaid Services ("CMS"). CMS in turn contracts with private organizations to act as Medicare Administrative Contractors ("MACs") to review and process Medicare claims submitted by hospitals and physicians for treatment of Medicare patients. 42 U.S.C. §§ 1395ff(a)(l), 1395kk-l(a)(3)-(4)).

14.    Under Part B, Medicare pays providers enrolled in fee-for-service ("FFS") programs based on set fees for each service (or bundle of services) that they provide. Part B only covers services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15k. CMS guidance further instructs contractors to "consider a service to be reasonable and necessary" if the procedure is:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - Ordered and furnished by qualified personnel; and,
  - One that meets, but does not exceed, the beneficiary's medical need.

Medicare Program Integrity Manual, Pub.100-08, Ch. 3, § 3.6.2.2, Ch. 13, § 13.5.4.

## GEHA FEHBP Plan

15.    GEHA is a carrier that contracts with the federal government, through the Office of Personnel Management ("OPM"), to provide health insurance subsidized by the federal government to federal employees and their families through the Federal Employees Health Benefit Program ("FEHBP"), established by

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14TH Floor
LOS ANGELES, CALIFORNIA 90024

1    Congress in 1959. *See* 5 U.S.C. § 8901 *et seq.* Funds for the FEHBP are maintained

2    in the Federal Employees Health Benefits Fund ("EHBF") and administered by

3    OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the

4    EHBF to cover the total cost of GEHA health care premiums, with the government

5    contributing between 72 and 75 percent of GEHA health care premiums, and the

6    federal employee contributing the rest. *See* 5 U.S.C. § 8906(a), (b). EHBF funds

7    are then used to pay GEHA for reimbursing the federal employee claims and for the

8    carrier's administrative expenses. *See* 5 U.S.C. § 8909; 48 C.F.R. § 1602.170–10.

9        16.    As an FEHBP plan, GEHA only covers services that are "medically

10   necessary to prevent, diagnose, or treat [an] illness, disease, injury, or condition."

11   *See e.g.*, 2019 GEHA Benefits Plan Brochure, 97; 5 U.S.C. § 8902(j). GEHA defines

12   "medically necessary" in relevant part as "[s]ervices, drugs, supplies or equipment

13   provided by a hospital or covered provider of the health care services" that the plan

14   determines:

> •    Are appropriate to diagnose or treat the patient's condition,
>       illness or injury;
> •    Are consistent with **generally accepted standards of medical
>       practice in the United States**.
>       Generally accepted standards of medical practice are based on
>       credible scientific evidence published in peer-reviewed medical
>       literature generally recognized by the relevant medical
>       community, national physician specialty society
>       recommendations and the views of medical practitioners
>       practicing in relevant clinical areas, and any other relevant
>       factors;
> . . . .
> •    The fact that a covered provider has prescribed, recommended,
>       or approved a service, supply, drug or equipment does not, in
>       itself, make it medically necessary.

25   2019 GEHA Benefits Plan Brochure, 115 (emphasis in original). This FEHBP

26   plan also does not cover "[e]xperimental or investigational procedures, treatments,

27   drugs or devices." 2019 GEHA Benefits Plan Brochure, 97.

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

<u>CMS-1500 Claim Form</u>

17.    Physicians seeking reimbursement for services provided to Medicare patients must submit claims on CMS-1500 form or its electronic equivalent to the Medicare MAC.  The same form must be used for GEHA FEHBP claims.   The CMS-1500 form identifies the provider, describes the services provided through a series of numeric codes called Common Procedural Terminology ("CPT") codes, and identifies the supporting diagnosis through another numeric coding system called International Classification of Disease ("ICD") codes.

18.    With respect to Medicare claims, the CMS-1500 form requires the physician to expressly certify, in relevant part, that "1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment . . . [and]; 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision."

<u>Dr. Skillern's Medicare and FEHBP Fraud</u>

19.    In 2007, Dr. Skillern and Li Sheng Kong, M.D., another board certified vascular surgeon, formed West Coast Vascular ("WCV"), a vascular group practice, which is headquartered at 100 North Brent Street, Suite 201, Ventura, CA 93003 in Ventura, California, and has regional offices in Santa Barbara, Thousand Oaks, Oxnard, and Lompoc, California.

20.    In 2009, Relator Dr. Guo, joined WCV as an employee and became a partner in 2010.  Relator Dr. Li joined the group in 2013 as an employee and became a partner in 2016.  In 2016, Kevin M. Casey, M.D. and Sara J. Runge, M.D.   joined

1  the practice as physician employees.

2      21.    WCV physicians specialize in the management and surgical treatment
3  of vascular disease, including peripheral arterial disease ("PAD"), carotid artery
4  disease, and abdominal aortic aneurysms.  In addition, WCV treats varicose veins
5  and has a dedicated dialysis access center providing patients with fistula, graft, or
6  catheter access and a limb care program for amputees.

7      22.    Each WCV doctor is responsible for coding of their own services for
8  billing purposes. The WCV billing department then submits claims for each
9  physician's services to the Medicare Programs under WCV's Medicare Provider
10 Transaction Access Number (PTAN) with the rendering physician identified by his
11 or her NPI, or under the rendering physician's GEHA provider number.   Dr.
12 Skillern's NPI was and his GEHA provider number was 1101184866.  While the
13 majority of WCVs patients are Medicare beneficiaries, a significant number of WCV
14 patients are also federal employees (or their family members) covered by GEHA, a
15 FEHBP plan.

16     23.    By 2019, the majority of WCV patient referrals were being made to the
17 practice group, rather than to individual physician partners. Although Dr. Skillern,
18 Dr. Kong and Relators, the four physician partners, were seeing close to the same
19 number of patients and working approximately the same number of hours, Dr.
20 Skillern's collections were more than double the collections of the other three
21 partners which were within 10% of each other.

22     24.    Between approximately 2016 and 2019, Dr. Skillern performed
23 numerous angiograms and peripheral vascular interventions, including endovascular
24 procedures and surgical bypasses ("PVIs") to diagnose and treat Medicare and Medi-
25 Cal patients with peripheral artery disease ("PAD").  With respect to each claim
26 submitted to the Medicare and GEHA programs for such angiograms and PVIs, Dr.
27 Skillern expressly or impliedly certified that the services that he had performed were
28 medically necessary.

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

A.    Generally Accepted Standards of Medical Practice for the
Diagnosis and Treatment of PAD

25.    PAD occurs when the peripheral arteries in the legs that provide oxygen, glucose, and other nutrients become obstructed, typically by plaque, a sticky substance made up mostly of fat and cholesterol, that narrows the passageway within the arteries and causes them to become stiff, limiting the blood flow to the legs.

26.    The symptoms of PAD are progressive, and the generally accepted standard of care varies accordingly.  The mere presence of atherosclerotic plaque in peripheral arteries shown on doppler ultrasound or a computed tomography ("CT") scan can usually be simply observed without intervention until the patients develop clinical symptoms.  Initially, patients typically report intermittent claudication ("IC"), which consists of muscle pain during exercise, usually in the calves and then in the thighs and buttocks, caused by the obstructed arteries' inability to increase the oxygen supply to the muscles being exerted.  Intermittent claudication is repetitive with the same amount of exertion and with the pain diminishing upon rest and does not involve numbness, weakness, or pain while simply standing, sitting, or lying down.  When the PAD is severe, the patients usually report at rest pain in their toes at night that wakes them up because the patients are lying down and gravity is no longer assisting the flow of blood to their legs, which is often an indication of critical limb ischemia ("CLI").  Severe PAD can also cause gangrene and ulceration of the leg tissue due to the lack of oxygen.  Untreated PAD can lead to limb loss.

27.    Both the Society of Vascular Surgery and the American College of Cardiology/American Heart Association have issued guidelines regarding accepted standards of medical practice for diagnosing and treating PAD.  *See* Conte MS, Pomposelli FB, Clair DG, Geraghty PJ, McKinsey JF, Mills JL, *et al.*, *Society for Vascular Surgery practice guidelines for atherosclerotic occlusive disease of the lower extremities: management of asymptomatic disease and claudication*, J. Vasc. Surg. 2015; 61 (Suppl):2S-41S ("2015 SVS Guidelines"); Gerhard-Herman MD,

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

Gornik HL, Barrett C, Barshes NR, Corriere MA, Drachman DE, *et al.*, *2016 AHA/ACC Guideline on the Management of Patients With Lower Extremity Peripheral Artery Disease: executive summary: a report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines*, Circulation 2017;135:e686-725 ("2016 ACC/AHA Guidelines").

28.     The cornerstone of diagnosing intermittent claudication caused by PAD for a patient complaining of leg pain is a comprehensive history and physical examination and the measurement of the patient's ankle-brachial index ("ABI"), with an index equal or less than 0.90 indicative of PAD.  It is clinically important to rule out of other causes of the pain that can mimic PAD symptoms, including neurogenic claudication (e.g., nerve root compression), venous claudication, hip, ankle and foot arthritis, and spinal stenosis. Although not necessary in all patients, Doppler ultrasounds to measure the blood pressure and flow in a patient's leg arteries can also be useful in diagnosing PAD.

29.     Angiograms with contrast and other imaging modalities that can more precisely localize arterial lesions should be reserved for patients in whom revascularization treatment is being considered. Invasive and noninvasive angiography should not be performed for the anatomic assessment of patients with asymptomatic PAD.  Nor should screening angiograms of other arterial beds be performed on patients with PAD because currently there is no evidence to demonstrate that screening all patients with PAD for asymptomatic atherosclerosis in other arterial beds improves clinical outcome.

30.     The generally accepted standard of care for intermittent claudication is non-interventional modification of risk factors (e.g., smoking cessation, control of blood pressure, cholesterol, diabetes, and weight loss), pharmacologic management, and exercise to train the muscles to be more resistant to a lower amount of blood supply. In most patients with intermittent claudication being evaluated initially, a 6-month trial of smoking cessation, risk factor modification, exercise, or cilostazol, or

a combination, should be initiated before any invasive therapy.

31.    Endovascular and open surgery PVIs to treat PAD are reserved for patients with persistent lifestyle-limiting claudication after a failed trial of pharmacologic management and exercise therapy and when there is a reasonable likelihood of symptomatic improvement with treatment because risk of limb loss due to claudication has been estimated as less than 5% over ten years. *See* Muluk SC, Muluk VS, Kelley ME, Whittle JC, Tierney JA, Webster MW, *et al.*, *Outcome events in patients with claudication: a 15-year study in 2777 patient*, J. Vasc. Surg. 2001; 33: 251-8.

32.    PVIs include endovascular procedures such as angioplasty and stent placement (where a balloon is inflated to open the artery and/or a mesh frame is then inserted to support the arterial walls) or atherectomy (where a catheter with a sharp blade or laser is inserted in the artery to remove obstructing plaque). Revascularization can also be accomplished through open bypass surgeries where a graft (e.g., a plastic tube or a vein from the patient's leg) is inserted to reroute the blood supply around the blocked leg artery.  However, surgical bypasses are generally reserved for patients with such extensive disease that [endovascular intervention] is impossible or ill advised, in patients with severe disease and associated aortic aneurysms, and in those with failed endovascular interventions. Performing prophylactic interventions in patients with IC that is minimally symptomatic or well tolerated has no benefit, may cause harm, and is never indicated.

33.    After PVIs for claudication, patients should have documented improvement in symptoms as well as hemodynamic evidence of improvement in lower extremity perfusion.  PVI patients should also have periodic clinical follow-ups, including simple hemodynamic measurements, at clinical intervals appropriate for the indication for intervention and the extent of disease treated.

34.    Unfortunately, non-invasive and invasive PAD interventions do not

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

11

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1   result in continuing peripheral vascular health.  Instead, recurrence of PAD is almost

2   universal as a result of the continuing atherosclerotic process and the impact of the

3   interventions themselves.   Recurrence is  especially  frequent  after PVIs  because

4   angioplasty/stent and atherectomy often cause scar tissue on the inner linings of the

5   arteries that itself obstructs blood flow.  Likewise, while open bypass surgery usually

6   provides a much longer relief of PAD symptoms than PVIs, there is still an expected

7   rate of recurrence.  The danger to the patient is that PAD recurrence after a PVI can

8   necessitate another surgery leading to a cycle of such interventions and the eventual

9   need  for  a  surgical  bypass  that  carries  the  risk  of  limb  amputation,  which  is

10  considered a catastrophic failure of PAD therapy.  For example, a recent study of

11  Medicare  beneficiaries  found  that  4.1%  of  patients  undergoing  outpatient

12  atherectomy for claudication required subsequent major amputation within just 1.5

13  years.  *See* Mukherjee D, Contos B, Emery E, Collins DT, Black JH, *High*

14  *reintervention and amputation rates after outpatient atherectomy for claudication*,

15  Vasc. Endovascular Surg 2018; 52:427-33.  As with any surgery, PVIs can also place

16  the patients at risk for loss of blood, infections, heart and lung malfunctions, and

17  anesthesia related complications, including possible death.

18        B.    2019 John Hopkins University Study of Dr. Skillern's

19              PVIs, Including Atherectomies

20      35.    In June 2019, the Society for Vascular Surgery published an article

21  entitled "Overuse of early peripheral vascular interventions for claudication" which

22  summarized  a  medical  study  of  the  incidence  of  early  PVIs  billed  for  Medicare

23  patients in the United States between 2015 and 2017 by vascular surgeons based on

24  a reported diagnosis of claudication.  *See* Hicks CW, Holscher CM, Wang P, Black

25  JH, Abularrage CJ, Makary MA, *Overuse of early peripheral vascular interventions*

26  *for claudication*, J. Vasc. Surg. 2019; 1-10.

27      36.    Using Medicare fee-for-service billing data, the study by John Hopkins

28  University  researchers  attempted  to  determine  whether  vascular  surgeons  were

1    following the SCV and ACC/AHA Guidelines recommending that procedures such
2    as lower extremity bypass operations and PVIs for claudication be performed only
3    for patients with persistent lifestyle-limiting claudication after a failed trial of
4    medical management and exercise therapy as a result of research "suggesting that
5    PVI carries a risk for limb loss that may be worse than the natural history of
6    medically managed claudication."

7          37.    This retrospective national cohort study of 5,664 physicians who
8    diagnosed 194,974 patients with claudication showed that the mean early PVI rate
9    (i.e., within 6 months of the claudication diagnosis) was 3.5%, but that 320
10   physicians (5.6%) had an early intervention rate of 14% or more, which was 2
11   standard deviations or more above the mean.

12         38.    The study also found that physicians with higher PVI rates performed
13   a greater percentage of their interventions in an ambulatory surgery center or office-
14   based laboratory ("OBL") compared with a hospital setting.  This supported a
15   "concern that some procedures for claudication may be overused for financial gain"
16   because the Medicare reimbursement rates for PVIs in an ASC or OBL setting are
17   significantly higher. For example, the 2018 Medicare reimbursement for a
18   femoropopliteal atherectomy and stent placement (CPT code 37227) was $10,864 if
19   the procedure was performed in an ASC, but only $765 if performed in a hospital.
20   The study also noted that another study of Medicare claims for PVIs found a 298%
21   increase in atherectomy cases in the OBL setting from 2011 to 2014, a trend that was
22   "particularly concerning, given that office-based PVI has been associated with a
23   higher risk of repeated revascularization compared with PVI performed in other
24   settings."

25         39.    On September 12, 2019, the Wall Street Journal ("WSJ") published an
26   article about the findings of the John Hopkins University study of early PVIs. *See*
27   9/12/10 WSJ Article, *Doctors Sound an Alarm Over Leg-Stent Surgery*.  The article
28   noted that Marty Makary, M.D. and Caitlin Hicks, M.D., two study authors, had

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

13

written a letter to CMS and the Society for Vascular Surgery stating that the researchers were "very concerned about these outlier physicians and the harm they may be inflicting on patients" and opining that "[s]ome may represent a serious and immediate threat to public safety." On information and belief, the letter to CMS identified Dr. Skillern as one of the outlier physicians who had an early intervention rate of 14% or more and included a list of ten physicians, including Dr. Skillern, who used atherectomy as the first intervention for 100% of patients with PAD:

Table 2. Data of most extreme 10 outlier physicians for the metric of use of atherectomy as the first intervention for PAD

| Physician | NPI | Location | Specialty | Atherectomy rate | Total amount paid to physician by CMS Part B in 2017 (USD) |
|---|---|---|---|---|---|
| Harold A. Tabaie | 1346286663 | California | Cardiac surgery | 100% | 22,794,890.48 |
| Moses Desmond Degraft-Johnson | 1194970475 | Florida | Vascular surgery | 100% | 3,615,656.6 |
| Samer Saiedy | 1326159864 | Maryland | Vascular surgery | 100% | 5,116,403.26 |
| Ravi Chandra Pulipati | 1487810305 | New York | Vascular surgery | 100% | 2,516,372.47 |
| Manuel Alejandro Gonzalez | 1639182371 | Florida | Cardiology | 100% | 4,439,854.65 |
| Christopher Shawn Skillern | 1205936697 | California | Vascular surgery | 100% | 3,991,639.13 |
| Mani Nallasivan | 1639171606 | California | Cardiology | 100% | 3,469,076.94 |
| Pranay T. Ramdev | 1588629620 | Florida | Vascular surgery | 100% | 1,400,321.56 |
| Daniel R. Nathanson | 1467653006 | California | Vascular surgery | 100% | 3,150,083.70 |
| Charles S. Drummond | 1609891803 | Tennessee | Vascular surgery | 100% | 1,331,690.90 |

40.    According to the WSJ article, Dr. Hicks stated that the study had shown that the average rate of atherectomy as a first option was 55% among 1,686 doctors paid by CMS for the procedure, but there were 114 physicians (including Dr. Skillern) with a 100% atherectomy rate. In Dr. Hicks' view, atherectomy is a procedure that many doctors say should be used selectively because there is no conclusive data to support its effectiveness. For his part, Dr. Makary stated that "there are rare situations when you need to do this, but to do it routinely is a clear-cut, egregious practice pattern."

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

C.    Dr. Skillern's Submission of False Claims

41.    Based on the John Hopkins University study and the Wall Street Journal article identifying Dr. Skillern as an outlier physician with respect to atherectomies, WCV conducted an internal medical review of 191 patients (the majority covered by Medicare) treated by Dr. Skillern during a 15-month period between May 2018 and the first quarter of May 2019 and including three random months in 2016 and 2017. The review was conducted by WCV physicians Guo, Li, Casey and Runge. Significant findings from the review are detailed below.

42.    In all 191 cases (100%), Dr. Skillern performed, interpreted and submitted or caused WCV to submit claims, including to the Medicare program and the GEHA FEHBP plan, for a diagnostic angiogram based on his finding of arterial wall lesions and one of more PVIs to treat those lesions;

43.    In 54 (28.2%) cases, Dr. Skillern knowingly submitted or caused WCV to submit false claims, including to the Medicare and the GEHA FEHBP plan, for his diagnostic angiograms and PVIs (including atherectomies) that were medically unnecessary and lacked a valid supporting diagnosis, including:

a.    False claims for diagnostic angiograms with a PVI when the patient had no leg pain, ulcerations, or other valid PAD symptoms, but instead were usually justified by Dr. Skillern solely on the amount of plaque seen on a Doppler ultrasound, in violation of generally accepted standards of practice;

b.    False claims for diagnostic angiograms and PVIs on non-ambulatory patients, including those who had not walked in years or had contracted knees, or on the amputated legs of patients, when such procedures were of no medical benefit to these classes of patients, in violation of generally accepted standards of practice;

c.    False claims for diagnostic angiograms for "vascular health," a medically invalid justification for performing this invasive and potentially lesion-producing procedure based solely on Dr. Skillern's finding of any plaque on a

15
COMPLAINT

1   Doppler ultrasound without any patient leg pain or other documented claudication

2   symptoms, in violation of generally accepted standards of practice;

3         d.    False claims for unnecessary PVIs where treatment of some

4   lesions was clinically indicated, but Dr. Skillern treated other lesions on a different

5   level of the leg that were causing less than 60%-70% stenosis (the accepted standard

6   for intervention) or were not present at all on the patient's diagnostic angiogram, in

7   violation of generally accepted standards of practice;

8         e.    False claims for unnecessary PVIs on the tibial arteries,

9   sometimes all three, when such PVIs are reserved for PAD cases involving rest pain

10  or ulceration that the patients did not have, in violation of generally accepted

11  standards of practice;

12        f.    False claims for unnecessary "drive-by" angiograms where a

13  carotid or upper extremity angiogram was medically necessary, but Dr. Skillern

14  would also perform an unnecessary leg angiogram that lacked any clinical

15  indication, or where a leg angiogram was medically indicated, but Dr. Skillern would

16  also perform unnecessary upper extremity angiograms, in violation of generally

17  accepted standards of practice;

18        g.    False claims for unnecessary contralateral interventions where an

19  angiogram and PVI on one leg of the patient was clinically indicated, but Dr. Skillern

20  performed the same treatment on the patient's other leg within a month or two

21  without any clinical indication and frequently without any intervening office visit or

22  Doppler ultrasound, and would also sometimes then also unnecessarily repeat the

23  PVI performed on the first leg as well, in violation of generally accepted standards

24  of practice; and

25        h.    False claims for unnecessary renal angiograms on patients with

26  end stage renal disease, in violation of generally accepted standards of practice.

27  44.    In 103 (53.9%) cases, Dr. Skillern knowingly submitted or caused

28  WCV to submit false claims, including to the Medicare program and the GEHA

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

16

COMPLAINT

FEHBP plan, for PVIs (including atherectomies), typically at the iliac and femoral popliteal levels where atherectomy reimbursement codes pay the most, based on his false documentation of lesions that were not present on the patients' diagnostic angiograms, including by sometimes failing to open up the bifurcation blood vessels so they were not on top of each other and either misidentifying part of a vessel as a lesion or identifying an alleged lesion that was obscured by an adjacent vessel.

45.     In order to justify false WCV claims for his unnecessary angiograms and PVIs, Dr. Skillern would knowingly (a) classify any patient leg pain as vascular without differentiating neuropathic, orthopedic and other causes unrelated to PAD, (b) misclassify "severe/critical limb ischemia" when the patient's ankle and toe pressures were normal or near normal; (c) misclassify venous and biopsy wounds as ulcers resulting from severe or critical PAD, and (d) give an inadequate amount of contrast for angiograms or use the tip of the contra catheter at the orifice of the superficial femoral artery to create an angiogram "swirl" effect in order to knowingly misidentify indications of arterial stenosis.

46.     Many of these false WCV claims for his unnecessary PVIs involved Dr. Skillern's use of atherectomy devices and balloons that were too small in order to minimize the cost and damage to blood vessels when he was "treating" non-existent or clinically insignificant lesions, including using devices for the tibial arteries for the larger femoral popliteal arteries.

47.     Other false WCV claims for his unnecessary angiograms and PVIs would involve office visit notes by Dr. Skillern that would include history and physical findings entered by staff conflicting with the assessment and treatment plan dictated by Dr. Skillern, and his office visit notes would also often conflict with his angiogram or PVI operative report. For example, in two cases, Dr. Skillern knowingly ordered unnecessary leg angiograms for patient R.S. who "walks 10000-13000 steps a day" and for patient F.O. who "walks 20 minutes every day even when he does not feel well after dialysis," in violation of generally accepted standards of

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1    practice.  Dr. Skillern would also often knowingly fail to document the "before" and

2    "after" appearance of the arteries on which he performed the PVIs which were

3    required to show that the procedure improved vascularization, in violation of

4    generally accepted standards of practice.

5               D.    Representative Examples of Dr. Skillern's False Claims

6          48.    Representative examples of Medicare or GEHA FEHBP patients for

7    whom Dr. Skillern knowingly submitted or caused WCV to submit false claims for

8    his unnecessary diagnostic angiograms and PVIs include the following 11 patients:

9               a.    Patient R.W., a 74-year-old male Medicare beneficiary with end

10   stage renal disease and severe PAD had below the knee amputation of his right leg

11   in 2013 and, more recently, had an above the knee amputation ("AKA") of his left

12   leg on January 5, 2018.  Patient also had multiple interventions for his arm fistula at

13   his dialysis access site.  Dr. Skillern's December 20, 2018 office note stated the

14   patient reported pain in his right hand one hour into dialysis and had diminished right

15   finger pressures, noted that patient's left AKA stump was well healed, and did not

16   document any leg pain or other clinical problems with the left leg.  In the same note,

17   Dr. Skillern scheduled an angiogram to explore the patient's indications of a possible

18   fistula-related ischemic steal at the dialysis access site on his right arm, and also

19   indicated that he would likely perform an angiogram of his amputated left leg

20   because the patient had severe PAD.  No Doppler ultrasound of the patient's left leg

21   was performed even though the last ultrasound of this leg had been performed on

22   October 19, 2017, more than a year before.  On or about December 31, 2018, Dr.

23   Skillern knowingly submitted or caused to be submitted false claims to Medicare for

24   an angiogram of the amputated left leg (CPT Codes 75710, 36247) and an

25   atherectomy of the superficial femoral artery in that leg (CPT Code 37225) which

26   were medically unnecessary because there was no clinical indication that the patient

27   had claudication in that leg, the superficial femoral artery showed no evidence of the

28   lesion falsely identified by Dr. Skillern as justifying atherectomy, and neither

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

18

1   procedure provided any medical benefit for this patient's AKA. Dr. Skillern also

2   made no mention of the performance or result of the left leg angiogram and

3   atherectomy in his office notes for the patient's next five visits.

4          b.    Patient N.N., an 87-year-old female Medicare beneficiary,

5   previously received left leg angiograms with stent placement at Hoag Hospital in

6   February 2018 and her cardiologist suggested a repeat left leg angiogram in order to

7   stave off amputation. At her first February 27, 2019 office visit, Dr. Skillern's note

8   stated: "She has no claudication or rest pain symptoms at present… My suspicion is

9   that she will not require angiography unless she develops critical limb ischemia. I

10  do not know why her cardiologist told her that she would need an intervention or

11  amputation." However, Dr. Skillern then included an immediate addendum which

12  stated: "Angiogram with possible revascularization scheduled in 1 to 2 weeks –

13  LLE." There was no documentation of any clinical indications supporting this

14  angiogram and Dr. Skillern's false diagnosis of "critical PAD" was clinically

15  unsupported.  On or about March 5, 2019, Dr. Skillern knowingly submitted or

16  caused to be submitted false claims to the Medicare progam for a left leg angiogram

17  (CPT Codes 75710, 36247) with atherectomy of the common femoral artery (CPT

18  Code 37225) and an angioplasty of the iliac artery (CPT Code 37220) which were

19  medically unnecessary because the patient reported no claudication and the lesions

20  on the iliac artery did not require intervention.  On March 26, 2019, Dr. Skillern

21  knowingly submitted or caused to be submitted false claims to the Medicare program

22  for a right leg angiogram (CPT Codes 75710, 36247) with atherectomies of the right

23  common femoral artery (CPT Code 37225), right superficial femoral popliteal (CPT

24  Code 37225) and tibial arteries (CPT Codes 37229, 37233) (which caused an

25  iatrogenic right popliteal arteriovenous fistula that required placement of a stent) and

26  angioplasties of the right iliac artery (CPT Codes 37220, 37222), that were medically

27  unnecessary because the patient reported no claudication and because the lesions or

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

COMPLAINT

1   stenosis in the iliac and right superficial femoral, popliteal and tibial arteries did not

2   need to be treated under generally accepted standards of practice.

3            c.    On August 1, 2018, Patient E.C., a 61-year-old male covered by

4   the GEHA FEHBP plan, who had diabetes and hypertension, presented with arm

5   pain. During his initial visit, the patient denied claudication, but Dr. Skillern then

6   documented patient complaints of claudication in both legs at the second September

7   12, 2018 visit without providing any clinical details about the character of the pain

8   or the specific symptoms, in violation of generally accepted standards of practice.

9   On or about September 21, 2018, Dr. Skillern knowingly submitted or caused to be

10   submitted false claims to GEHA for a left leg angiogram (CPT Codes 75710, 36247)

11   and percutaneous transluminal angioplasty with atherectomy of the left proximal

12   superficial femoral artery (CPT Code 37225) which were medically unnecessary

13   without a failed trial of exercise and pharmacologic management and because the

14   lesion in the superficial femoral artery was mild and the leg angiogram showed

15   peroneal run-off only and mild femoral popliteal disease with decent filling of the

16   left foot through collateral blood vessels.  On or about December 6, 2018, the patient

17   presented with rest pain in the left foot.  The following day, Dr. Skillern performed

18   a second left leg angiogram during which a terrible air embolism occurred. On or

19   about December 17, 2019, the patient's left leg was amputated below the knee.  On

20   or about February 8, 2019, Dr. Skillern knowingly submitted or caused to be

21   submitted false claims to GEHA for a second angiogram on the patient's right leg

22   (CPT Codes 75710, 36247) and atherectomies of the femoral  popliteal (CPT Code

23   37225) and tibial arteries (CPT Codes 37229, 37233), which were medically

24   unnecessary because he failed to document any indication of tissue loss, rest pain or

25   claudication in that limb and, in connection with an earlier October 19, 2018

26   angiogram on the right leg, had previously documented that the alleged claudication

27   in both legs had resolved.

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

COMPLAINT

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

d.      Patient M.G., a 73-year-old female Medicare beneficiary with end-stage renal disease had left and right leg angiograms performed for low toe pressures and severe claudication on October 6 and November 3, 2017, respectively. More than a year later, on February 27, 2019, Dr. Skillern's clinic note stated: "She has no problems with walking and denies claudication, rest pain, or ulcers." On or about March 15, 2019, Dr. Skillern knowingly submitted or caused to be submitted false claims to Medicare for a left leg angiogram (CPT Codes 75710, 36247) and atherectomies on the posterior tibial artery (CPT Code 37229) and profunda femoris artery (CPT Code 37229) which were medically unnecessary because the patient had no claudication or other medical indication supporting these procedures, the stenosis in the tibial artery did not require atherectomy and was justified by Dr. Skillern with a false diagnosis of "intermittent lower extremity rest pain," and the profunda femoris artery did not require atherectomy and was justified by Dr. Skillern based on a lesion that did not exist and which he treated using a device (SilverHawk EXL) that was too small for that artery. On May 22, 2019, an office visit note documented the patient's complaint of constant and equal pain in both calves. On or about June 14, 2019, Dr. Skillern knowingly submitted or caused to be submitted false claims to Medicare for a right leg angiogram (CPT Codes 75710, 36247) with a right common iliac artery angioplasty (CPT Code 37220), and atherectomies of the right popliteal artery (CPT Code 37225) and peroneal artery (CPT Code 37229) that were medically unnecessary because the angiogram lacked clear indications of claudication caused by PAD, the right common iliac artery angioplasty was based on Dr. Skillern's false documentation of a non-existent lesion and non-existent stenosis, the atherectomy on the right popliteal artery lacked clear evidence of any lesion, and the peroneal artery did not show stenosis warranting an atherectomy. Dr. Skillern also failed to document the angioplasty ballooning or any post-atherectomy angiogram images, in violation of generally accepted standard of practice.

e.      On November 29, 2018, Patient R.L., an 83-year-old male Medicare beneficiary, presented with "peripheral vascular disease" after a November 15, 2018 Doppler ultrasound was interpreted as showing severe stenosis in his left popliteal artery, unremarkable toe pressures (62 and 66 mmHg) and an improved (and normal) toe-brachial index of 0.87 and 0.72. Dr. Skillern's office note stated that the patient was "walking fine" for 30 minutes a day without pain or cramping, had diminished left ankle pulses, and no leg tissue loss. On or about February 8, 2019, Dr. Skillern knowingly submitted or caused to be submitted false claims to Medicare for a left leg angiogram (CPT Codes 75716, 36247) with angioplasty and atherectomy of the tibial artery (CPT Code 37229), angioplasty of the anterior tibial artery (CPT 37232) and atherectomy of the left popliteal artery (CPT Code 37225), which were medically unnecessary because the patient had no leg pain or claudication justifying any of these procedures and Dr. Skillern instead knowingly documented a false supporting diagnosis of "severe lower extremity peripheral arterial disease with lower extremity pain and claudication" that was clinically false.

f.      Patient L.G., an 86-year-old male Medicare beneficiary, initially presented with carotid stenosis on May 5, 2019 with a CT angiogram showing 75-80% stenosis of his left carotid artery. Dr. Skillern's note did not document any complaints of lower extremity problems and stated: "I do not get the sense that he has significant claudication symptoms. We will check a bilateral lower extremity arterial duplex scan." At the patient's next May 30 visit, Dr. Skillern's note stated: "The patient denies any claudication symptoms, rest pain, or lower extremity ulcers. Interpretation of arterial duplex study dated 5-28-2019 and results were discussed with the patient," but also concluded: "He has severe right SFA stenosis. We will evaluate this at the time of his angiography." On or about June 28, 2019, Dr. Skillern submitted a valid claim for an angiogram with the indication of carotid angiography, but also submitted or knowingly caused to be submitted claims to Medicare for a

1  right leg angiogram (CPT Codes 75710, 36247), an angioplasty of the iliac artery

2  (CPT 37220) and atherectomies of the femoral popliteal (CPT 37225) and tibial

3  (CPT Code 37229) arteries, which were medically unnecessary because Dr.

4  Skillern's false diagnosis that patient "has right lower extremity peripheral artery

5  disease and claudication symptoms" was unsupported by any clinical indications,

6  the patient's pre-op toe pressures were strong at 62 and 66 mmHg in each leg, the

7  right anterior tibial artery had no visible stenosis, and the right superficial femoral

8  artery stenosis was mild and did not warrant atherectomy.

9        g.    Patient R.W., an 81-year-old female Medicare beneficiary, with

10  end-stage renal disease on dialysis was seen by Dr. Skillern in clinic on May 30,

11  2018. She ambulated with a walker or used a wheelchair and reported "no pain while

12  walking" and the review of systems indicated no claudication or rest pain.  On

13  physical exam, she had diminished but palpable pedal pulses and her bilateral lower

14  extremity arterial duplex ultrasound showed right leg mid-popliteal artery moderate

15  stenosis, but with preserved multiphasic distal waveforms and a normal ankle-

16  brachial index ("ABI") of 0.92 and left leg femoral and proximal superficial femoral

17  artery moderate stenoses, but with preserved distal multiphasic waveforms and a

18  normal ABI of 1.0. Despite the lack of reported history and PAD symptoms and the

19  unremarkable Doppler ultrasound results, Dr. Skillern's assessment and plan falsely

20  documented claudication pain and scheduled angiograms of both legs.  On or about

21  June 15, 2018, Dr. Skillern knowingly submitted or caused to be submitted false

22  claims to Medicare for a left leg angiogram (CPT Codes 75710, 36247), angioplasty

23  and stenting of the iliac artery (CPT Code 37221) and atherectomy of the superficial

24  femoral artery (CPT 37227) that perforated the artery (requiring balloon angioplasty

25  and stent placement) which were medically unnecessary because these two

26  procedures were performed without any claudication or other clinical indication to

27  justify them. During a September 12, 2018 office, Dr. Skillern again reported that

28  the patient reported no pain while walking.  On or about October 19, 2018, Dr.

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

23

1    Skillern also knowingly submitted or caused to be submitted false claims to
2    Medicare for a right leg angiogram (CPT Codes 75710, 36247), angioplasty and
3    stenting of the iliac artery (CPT Code 37221) and atherectomies of the femoral
4    popliteal (CPT Code 37225), and tibial (CPT Code 37229) arteries, that were also
5    medically unnecessary for the same reasons.

6             h.     Patient E.T., a 69-year-female Medicare beneficiary with end-
7    stage renal disease had an April 25, 2018 bilateral lower extremity arterial duplex
8    ultrasound which showed multiphasic waveforms throughout both legs, with
9    bilateral posterior tibial artery occlusions, but with relatively good toe waveforms
10   (right 1st toe pressure of 42 mmHg, left 1st toe pressure of 58 mmHg).  On April 27,
11   2018, Dr. Skillern saw the patient who complained of left finger numbness but
12   reported no lower extremity symptoms although her pedal pulses were not palpable
13   on examination.  On or about May 11, 2018, Dr. Skillern knowingly submitted or
14   caused to be submitted a false claim to Medicare for a left leg angiogram (CPT Codes
15   75710, 36247), and angioplasties (CPT 37247) and atherectomies of the popliteal
16   (CPT Code 37225) and tibial arteries (CPT 37229) which were medically
17   unnecessary because the procedures were performed without a failed trial of
18   pharmacologic management and exercise, the patient had no symptoms of
19   claudication despite the occlusion of both her tibial arteries, and the angiogram
20   showed no lesions in the popliteal artery justifying atherectomy in this artery.  This
21   false claim also included bilateral renal angiograms (CPT Code 75736) that were
22   medically unnecessary because the patient was not on high dosages of at least 3-4
23   antihypertensive medications, had no history of flash pulmonary edema, and already
24   had end-stage renal disease, in violation of generally accepted standards of medical
25   practice.  Even though these renal angiograms revealed an approximately 50% right
26   renal artery stenosis, Dr. Skillern performed no intervention on this artery, again
27   outside the usual course of professional practice. DR. SKILLERN's May 31, 2018
28   follow-up note indicated the patient "has no problems with ambulation but does not

1  want her peripheral arterial disease to progress" and documented his plan to perform

2  a right leg angiogram, again without any documented PAD symptoms.

3          i.    Patient M.R., a 64-year-old male Medicare beneficiary with end-

4  stage renal disease, presented with a complaint of left leg cramping at the end of

5  dialysis, a common occurrence for hemodialysis patients resulting from localized

6  electrolyte imbalances that is unrelated to PAD.  On February 15, 2018, Dr. Skillern

7  ordered an arterial duplex ultrasound which showed occlusions of the left proximal

8  anterior tibial, posterior tibial, and peroneal arteries, but the patient still had good

9  toe pressures of 140 mmHg, and a normal toe-brachial index of 0.76 and SKILLERN

10  failed to document peripheral pulses.  On or about April 3, 2018, Dr. Skillern

11  knowingly submitted or caused to be submitted a false claim to Medicare for a left

12  leg angiogram (CPT Codes 75710, 36247) and atherectomy on the mid-popliteal

13  artery (CPT Code 37225) which were medically unnecessary because the procedures

14  were performed without a failed trial of pharmacologic therapy and exercise, the

15  patient had no symptoms consistent with claudication, and the artery had very mild

16  stenosis that did not justify atherectomy.  On or about May 15, 2018, Dr. Skillern

17  knowingly submitted or caused to be submitted another false claim to Medicare for

18  a right leg angiogram (CPT Code 75710) and atherectomies on the mid-popliteal

19  (CPT Code 37225), and tibial (CPT Codes 37229, 37233), which were medically

20  unnecessary for the same reasons and because the angiogram showed no significant

21  popliteal artery lesions justifying atherectomy on that artery.  A May 31, 2018

22  follow-up visit note by Dr. Skillern also documented that patient "does not walk very

23  often but when he does, he does not experience any problems."

24          j.    Patient T.S., a 49-year-old female Medicare beneficiary, in a

25  wheelchair due to cerebral palsy and severe scoliosis, was seen by Dr. Skillern on

26  May 17, 2018 with a complaint of edema in her legs.  Dr. Skillern's visit note

27  documented that the patient could briefly stand for transfers from the wheelchair and

28  had no wounds, tissue loss, claudication pains or ischemic pain at rest.  On physical

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14th Floor
LOS ANGELES, CALIFORNIA 90024

COMPLAINT

1    exam, she had diminished, but palpable, pedal pulses. While Dr. Skillern planned a

2    Duplex ultrasound of the lower extremities, no ultrasound was performed. Instead,

3    on or about May 22, 2018, Dr. Skillern knowingly submitted or caused to be

4    submitted a false claim to Medicare for a right leg angiogram (CPT Codes 75716,

5    36247) with an atherectomy on a high-grade right superficial femoral artery lesion

6    (CPT Code 37225) which were medically unnecessary because there was no

7    claudication or other clinical indication documented by Dr. Skillern to justify either

8    procedure.

9          k.    On December 20, 2017, Patient D.M., a 68-year-old male

10   Medicare beneficiary with PAD presented with a complaint of "worsening pain in

11   his right leg." Dr. Skillern's prior treatment of PAD in the patient's left leg had

12   failed and resulted in an above the knee amputation of his left leg on June 17, 2015,

13   but Dr. Skillern's December 20, 2017 office note stated that "his left AKA has

14   completely healed" and did not document any pain or claudication in the left leg.

15   On exam, the patient had diminished pedal pulses in his right leg with an abnormal

16   toe pressure of 38 mmHg, and an abnormal toe-brachial index of 0.30 which Dr.

17   Skillern interpreted as showing "severe femoropopliteal disease" for which an

18   angiogram and possible revascularization of the right leg would be scheduled. On

19   March 23, 2018, Dr. Skillern knowingly submitted or caused to be submitted a false

20   claim to Medicare for an angiogram of the **left** amputated leg (CPT Code 75710)

21   and angioplasties and stenting of the left iliac artery (CPT Codes 37221, 37222) and

22   atherectomy of the common femoral artery (CPT Code 37225) which were

23   medically unnecessary because the patient had no pain or claudication in his left

24   AKA leg to justify any of these procedures, the femoral artery showed no evidence

25   of the lesion falsely identified by Dr. Skillern as justifying atherectomy, and none of

26   the procedures provided any medical benefit for this patient's left AKA. Dr.

27   Skillern's next June 20, 2018 office visit note did not mention the performance and

28   results of the procedures on the patient's left AKA and he did not perform an

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

26

1   angiogram and PVIs on the right leg until May 11, 2018 despite his diagnosis of

2   "severe femoropopliteal disease" in that leg five months earlier.

3       49.    Dr. Skillern's treatment of the 10 Medicare patients and one GEHA

4   FEHBP plan patient described above all resulted in false claims that he knowingly

5   submitted or caused WCV to submit to Medicare or GEHA because the billed

6   angiograms and PVIs that he performed were medically unnecessary and he knew

7   that Medicare and GEHA do not reimburse providers for medically unnecessary

8   services.

9       50.    The false claims for these 11 patients are examples of a pattern of Dr.

10  Skillern knowingly submitting or causing WCV to submit claims to the Medicare

11  program or the GEHA FEHBP plan that were medically unnecessary.

### FIRST CAUSE OF ACTION

### FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

### 31 U.S.C. § 3729(a)(1)(A)

15      51.    The United States repeats and re-alleges the allegations contained in

16  Paragraphs 1 to 50 above as though they are fully set forth in this paragraph.

17      52.    Between 2016 and 2019, defendant Skillern knowingly presented or

18  caused to be presented false or fraudulent claims on CMS-1500 forms for payment

19  or approval to the United States for angiograms and PVIs performed on Medicare

20  and GEHA FEHBP patients that were medically unnecessary and not covered by the

21  Medicare program and the GEHA FEHBP plan.

22      53.    By virtue of said false or fraudulent claims, the United States incurred

23  damages, according to proof at trial, and therefore is entitled to treble damages under

24  the FCA, plus a civil penalty for each violation of the statute.

### SECOND CAUSE OF ACTION

### FALSE CLAIMS ACT: MAKING FALSE RECORDS OR STATEMENTS

### 31 U.S.C. § 3729(a)(1)(B)

28      54.    The United States repeats and re-alleges the allegations contained in

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1   Paragraphs 1 to 41 above as though they are fully set forth in this paragraph.

2       55.   Between 2016 and 2019, defendant Skillern knowingly made, used, or

3   caused to be made or used false records and statements, including with respect to

4   patients' symptoms, diagnoses, and disease progression, that were material to false

5   or fraudulent claims for medically unnecessary angiograms and PVIs that were

6   presented to the United States for payment or approval.

7       56.   By virtue of said false statements or records, the United States incurred

8   damages, according to proof at trial, and therefore is entitled to treble damages under

9   the FCA, plus a civil penalty for each violation of the statute.

10                                  **PRAYER**

11      WHEREFORE, the United States requests that judgment be entered in its

12  favor and against defendant Skillern as follows:

13      1.    On its First Cause of Action for Presentation of False Claims, for the

14  amount of the United States' damages, trebled as required by law, together with the

15  maximum civil penalties allowed by law, costs, post-judgment interest, and such

16  other and further relief as the Court may deem appropriate.

17      2.    On its Second Cause of Action for Making False Records or

18  Statements, for the amount of the United States' damages, trebled as required by

19  law, together with the maximum civil penalties allowed by law, costs, post-judgment

20  interest, and such other and further relief as the Court may deem appropriate.

21  Dated: April 15, 2020              Respectfully submitted,

22                                     NELSON HARDIMAN LLP

23

24                                     By: _____
                                           Katherine A. Bowles
25                                         Attorneys for Relators
                                           Sydney Guo, M.D., and Edward Li, M.D.

26

27

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

28
COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

## **DEMAND FOR JURY TRIAL**

The United States of America hereby demands a trial by jury.

Dated: April 15, 2020                    Respectfully submitted,

NELSON HARDIMAN LLP

By: _____
Katherine A. Bowles
Attorneys for Relators
Sydney Guo, M.D., and Edward Li, M.D.

COMPLAINT

